UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
PERRIGO COMPANY and PERRIGO NEW :
YORK, INC.,                                                   :
                                                              :
                    Plaintiffs,                              :
                                                              :
            v.                                                :       08-CIV-_____
                                                              :
SAMUEL SIRKIN,                                                :
                                                              :
                    Defendant.                                :
------------------------------------------------------------x

COMPLAINT

[MAR 1 4 2008 U.S.D.C. S.D.N.Y. CASHIERS]

1.   Plaintiffs Perrigo Company and Perrigo New York, Inc. (collectively "Perrigo" or "the Company") bring this action against Defendant Samuel Sirkin ("Sirkin"), to recover in excess of $6 million in damages incurred as a result of Sirkin's breach of contract and misappropriation of funds. Perrigo also seeks a declaratory judgment that its termination of Sirkin's employment was consistent with any and all applicable contractual and legal obligations.

2.   Sirkin was employed by Perrigo New York, Inc., formerly known as Clay-Park Labs, Inc. ("Clay-Park"), from the late 1980s until mid-2007, most recently as the Executive Vice President of Sales and Marketing.

3.   During his employment with Perrigo, Sirkin engaged in a number of schemes to defraud Perrigo of corporate funds to which he was not entitled. In particular, for example, upon information and belief, those schemes included the following misconduct: (1) using the Clay-Park corporate credit card for personal purposes without reimbursing the company; (2) receiving personal "loans" from the company with no intention of repaying them; and (3) receiving kickbacks and other unauthorized payments from third parties.

4.  During his employment with Perrigo, Sirkin also failed to devote his full time and attention to his assigned duties on behalf of Perrigo, as required by his Employment Agreement with Perrigo, and instead actively devoted time and attention to benefiting other companies from which he received compensation and benefits without Perrigo's authorization. In particular, for example, upon information and belief, in early 2005, while employed by Perrigo, Sirkin took an active role in recruiting and interviewing a new Executive Vice President of Sales and Marketing for Allan Pharmaceutical L.L.C. ("Allan"), a company in which Sirkin maintained a financial interest.

5.  Throughout the time of his employment with Perrigo, and continuing through the present, Sirkin has concealed his misconduct so that it would not be known to Plaintiffs.

**Parties**

6.  Plaintiff Perrigo Company is a corporation organized under the laws of Michigan with its principal place of business at 515 Eastern Avenue, Allegan, Michigan 49010. Perrigo is a global health-care supplier and a manufacturer of over-the-counter (OTC) pharmaceutical and nutritional products for the store-brand market.

7.  Plaintiff Perrigo New York, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 1700 Bathgate Avenue, Bronx, New York 10457. Prior to its acquisition by Perrigo Company, which was completed in March 2005, Perrigo New York, Inc. was known as Clay-Park Labs, Inc. Perrigo is a successor in interest to Clay-Park.

8.  Upon information and belief, Defendant Samuel Sirkin is a United States citizen residing at 77 Hidden Brook Drive, Southbury, Connecticut 06488.

## Jurisdiction And Venue

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and Perrigo alleges that its damages exceed $75,000. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 et seq.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to the claims herein occurred within this judicial district.

## Background

### Misappropriations and Other Misconduct by Sirkin

11. Sirkin began working for Perrigo in the 1980s (when it was known as Clay-Park), and he held an ownership interest in the Company until it was sold in 1995. During the period prior to 1995, Sirkin abused his position as a part owner of the Company and improperly misappropriated corporate funds.

12. In 1995, when the Company was acquired by Agis Industries (1983), Ltd., Sirkin formed an alliance with the new CEO of the Company, Giora Carni ("Carni"), to continue and expand on his schemes to misappropriate funds from the Company as detailed below.

### Misuse of Company Credit Card

13. Beginning at least in the early 1990s, Sirkin had access to a Company American Express card.

14. Upon information and belief, Sirkin regularly charged personal expenses totaling thousands of dollars to the Company credit card, without providing documentation regarding his credit card purchases or reimbursing the Company for those expenses.

15. Over the years, Sirkin misappropriated substantial sums from the Company through personal charges for which he has not provided reimbursement.

16. In late 2004, when the Company was about to be acquired by Perrigo Company, Sirkin instructed the accounts payable manager, June B. Polacek, who was responsible for maintaining the credit card records, to destroy all records related to Sirkin's use of the Company credit card in an effort to hide his misappropriations. At that time, Sirkin stated that "it had been a good run while it lasted."

### Unauthorized Kickbacks from Third Parties

17. Sirkin was responsible for selecting and working with the sales brokers who facilitated sales of the Company's products to certain purchasers (such as Wal-Mart, CVS, etc.).

18. Broker commissions were a significant expense for the Company, totaling approximately $2 million per year during the period 2000 to 2004. Sirkin defended the amounts of these broker commissions and refused to consider lowering them when it was suggested by the Company's Chief Financial Officer.

19. Upon information and belief, starting no later than the late 1990s and continuing at least until 2004, Sirkin received a portion of the sales commissions paid to the brokers by the Company as unauthorized kickback payments for continuing the Company's relationship with the brokers.

20. Upon information and belief, if the brokers had not kicked back a portion of their commissions to Sirkin, the Company would have saved in excess of $3 million during the period 2000 to 2004. Sirkin instead misappropriated that money for his personal benefit.

### Kickbacks from ProDerma and PharmaPak

21. Sirkin's brother, Neil Sirkin, operates two companies, ProDerma and PharmaPak, who manufacture certain products for the Company. Between 2002 and 2005, the Company paid ProDerma and PharmaPak collectively more than $11.5 million.

22. Upon information and belief, Sirkin arranged for ProDerma and PharmaPak to be supplied with equipment and inventory by Clay-Park. Clay-Park also assisted ProDerma and PharmaPak with quality assurance and testing. Such an arrangement was not a usual business practice in the industry.

23. Upon information and belief, Sirkin received a portion of the payments made by the Company to ProDerma and PharmaPak and otherwise benefited personally as a result of those payments. The value of these surreptitious and unauthorized kickback payments and benefits received by Sirkin is currently unknown.

### Kickbacks from Tubbox

24. The Company incurs significant expenses in purchasing tubes and boxes that it uses to package its products. In early 2003, Sirkin took part in the decision to move the Company's purchases of tubes and boxes to a foreign company called Tubbox.

25. Upon information and belief, Tubbox acted as a broker for certain Turkish companies that manufacture tubes and boxes. For each order, the Company was required to make separate payments, one to Tubbox and the second to the Turkish company that manufactured products to fill the order.

26. The Company's payments to Tubbox were not consistent with how it made payments to other vendors. The Company was not able to inspect the products to determine if they were defective until after it had already paid Tubbox. Documentation related to Tubbox was kept separate from and outside the Company's normal bookkeeping system and was maintained in a secretive manner outside the control of the Company's Chief Financial Officer.

27. From 2003 through 2005, the Company paid Tubbox in excess of $4.5 million.

28. Upon information and belief, Sirkin received a share of the payments made to Tubbox for his personal benefit. In exchange, Sirkin and others ensured that the Company continued to make payments to Tubbox.

29. In 2003, Sirkin and the Company's then-CEO, Carni, formed an entity called TB Consulting LLC ("TB Consulting"), with Sirkin and Carni as its only members and Sirkin as its registered agent. During 2003 and 2004, TB Consulting purchased two apartments in Manhattan located at 144 Columbus Avenue, Unit 26E and 1965 Broadway, Unit 23K.

30. Upon information and belief, the cash to pay for the two apartments came from the payments made by the Company ostensibly to Tubbox.

31. On January 30, 2006, TB Consulting conveyed the Columbus Avenue apartment to Sirkin and the 1965 Broadway apartment to Carni and dissolved shortly thereafter. Sirkin sold the apartment at 144 Columbus Avenue on September 15, 2006 for $1,165,000, and on the same day, he purchased an apartment at 120 Riverside Blvd., Apt. 8A (Trump Place) for $863,500. Sirkin realized a profit of $765,000 on the sale of the Columbus Avenue apartment, which represents money that was improperly taken from Clay-Park and a return on that misappropriated money.

### "Loans" Improperly Received But Not Repaid By Sirkin

32. During 1998 and 1999, Sirkin received at least five improper payments which were characterized as "loans" on the Company's books. The payments were not accounted for as income to Sirkin.

33. Sirkin never intended to repay these "loans" and in fact has not repaid these "loans" or paid any interest on them, despite the passage of more than eight years. Instead, upon

information and belief, he arranged to have the "loans" written off the Company's books while continuing not to report the payments as personal income.

34. On July 18, 1996, Sirkin executed a Promissory Note in the amount of $280,000 in favor of the Company. Pursuant to its terms, this note became due on October 14, 1998, but Sirkin did not pay it.

35. On July 31, 2000, Sirkin entered into a Stock Option Agreement with the Company. In that Agreement, Sirkin acknowledged his indebtedness to the Company in the original principal amount of $280,000 and interest from that date forward was set at 6% per annum. The Company agreed not to require Sirkin to pay the Promissory Note until one of several specified conditions occurred. One of those conditions was if Sirkin exercised his stock options.

36. On or about September 29, 2004, Sirkin exercised his stock options which caused the Promissory Note to become due and payable. On that same date, Sirkin entered into a written Employment Agreement with the Company. That Agreement forgave the interest on the $280,000 debt and then forgave the principal in three equal parts with the last portion scheduled to be forgiven on July 31, 2007.

37. The Company would not have entered into these agreements with Sirkin if it had known of Sirkin's misconduct described above. As a result of Sirkin's concealment of his misconduct, he has benefited at the Company's expense in the amount of $280,000 plus interest running from at least October 14, 1998.

### Sirkin's Diversion Of Time And Attention To Benefit Other Companies

38. Sirkin's most recent Employment Agreement with Perrigo was effective from August 1, 2004 through July 31, 2007. The Agreement requires that Sirkin "shall devote his full

7

time and attention to the performance of his duties. Except as otherwise herein provided, [Sirkin] shall not engage in any other business or occupation without the Company's written consent; provided however, nothing contained herein shall prohibit [Sirkin] from making passive or personal investments for which the expenditure of time is not required." Employment Agreement § 3(B).

39.  The Employment Agreement further expressly authorized Perrigo to terminate Sirkin's employment for, *inter alia*, (1) "Failure to materially perform the duties and/or responsibilities assigned to him in a manner satisfactory to the Company . . . ."; (2) "The engaging by Employee in a course of misconduct in connection with the affairs of the Company or any company that directly or indirectly controls, or is controlled by, or is under common control with the Company (each, an 'Affiliate') which in the good faith and reasonable opinion of the Company, is, or is likely to be, materially harmful to the Company or any of its affiliates"; and (3) "Theft, embezzlement, or fraud by [Sirkin] in connection with the affairs of the Company or any of its affiliates." Employment Agreement § 8(A).

40.  Upon information and belief, Sirkin is a part owner of Allan and has devoted substantial time and attention to the management and promotion of Allan without authorization from Perrigo. Sirkin's unauthorized efforts on behalf of companies other than Perrigo have been in breach of his Employment Agreement and contrary to Perrigo's best interests.

41.  Specifically, and by way of example, in February of 2005, Sirkin, along with his brother Neil Sirkin, met with Louis Dretchen ("Dretchen") in Connecticut to interview Dretchen for the position of Executive Vice President of Sales and Marketing at Allan. In March of 2005, Sirkin and his brother interviewed Dretchen for the position for a second time.

\\·NY - 025645/000002 - 1076905 v1

42. At the time that Sirkin recruited and interviewed Dretchen for a management position at Allan, he was employed by Perrigo and bound by the terms of his Employment Agreement with Perrigo. Perrigo did not give Sirkin consent, written or otherwise, to engage in business activities on behalf of Allan or any other company or individual.

### Fraudulent Concealment

43. Sirkin has fraudulently concealed his misappropriations and other misconduct from the Company.

### Causes of Action

### First Cause Of Action
(Fraud)

44. Plaintiffs hereby incorporate all of the averments in the paragraphs above as if fully set forth herein.

45. Sirkin knowingly made misrepresentations of material facts to the Company in submitting improper credit card charges for reimbursement, stating that he had or would repay "loans," and directing or facilitating payments to third parties.

46. Sirkin knowingly and intentionally made such misrepresentations with the purpose of inducing the Company to rely on them. Sirkin made such misrepresentations and omissions to benefit himself at the expense of the Company.

47. The Company reasonably relied on Sirkin's misrepresentations.

48. As a direct and proximate result of Sirkin's fraudulent misrepresentations, the Company has sustained damages in the amount believed to be in excess of $6 million, plus interest thereon, the exact amount to be proven at trial. As a further result, Perrigo also has incurred substantial damages and expenses in uncovering Sirkin's misconduct.

## Second Cause Of Action
### (Breach of Fiduciary Duty and Duty of Loyalty)

49. Plaintiffs hereby incorporate all of the averments in the paragraphs above as if fully set forth herein.

50. At all times material hereto, Sirkin was an employee of the Company.

51. As such, Sirkin owed a fiduciary duty and duty of loyalty to the Company. Pursuant to those duties, Sirkin was prohibited from acting in any manner inconsistent with his agency and was required not to misappropriate or waste the Company's assets.

52. In misappropriating Company funds for his own use as described above, Sirkin breached his fiduciary duty and duty of loyalty to the Company.

53. As a direct and proximate result of Sirkin's breaches of his fiduciary duty and duty of loyalty, Perrigo has sustained damages in an amount believed to be in excess of $6 million, plus interest thereon, the exact amount to be proven at trial. As a further result, Perrigo also has incurred substantial damages and expenses in uncovering Sirkin's misconduct.

54. In addition, Sirkin's actions were adverse to the Company and amounted to such a fraud on the Company that he has forfeited any right to compensation since the time of his first wrongful act, which is believed to have occurred at least as early as the beginning of 1991, the exact date of which to be proven at trial.

## Third Cause of Action
### (Breach of Contract)

55. Plaintiffs hereby incorporate all of the averments in the paragraphs above as if fully set forth herein.

56. During periods relevant to this claim, a valid and binding contract existed between Sirkin and Plaintiffs. The Employment Agreement required Sirkin, *inter alia*, to devote

his full time and attention to the Company's business and prohibited him from (1) engaging "in any other business or occupation without the Company's written consent," and (2) engaging in misconduct including theft, embezzlement, and fraud.

57. By the misconduct described above, Sirkin breached his obligations under the contract.

58. As a result of Sirkin's breach of contract, Perrigo has suffered damages in an amount believed to be in excess of $6 million.

59. Sirkin's misconduct and unfaithfulness substantially violated his contract of service so that it also entitles Perrigo to repayment of all compensation paid to Sirkin since his first act of disloyalty which is believed to have occurred at least as early as 1991, the exact date of which to be proven at trial.

## Fourth Cause of Action
### (Fraudulent Concealment)

60. Plaintiffs hereby incorporate all of the averments in the paragraphs above as if fully set forth herein.

61. As explained above, Sirkin, as an employee, owed a fiduciary duty and a duty of loyalty to the Company. As such, he was required to make truthful and complete disclosures to the Company and he had a duty not to conceal material facts from the Company.

62. Sirkin concealed material facts – including his diversion of company funds for his own personal use – from the Company.

63. Upon information and belief, Sirkin knowingly and intentionally concealed such material facts to benefit himself at the expense of the Company.

64. As a direct and proximate result of the Sirkin's fraudulent concealment, Perrigo has sustained damages in the amount believed to be in excess of $6 million, plus interest thereon,

11

the exact amount to be proven at trial. As a further result, Perrigo also has incurred substantial damages and expenses in uncovering Sirkin's misconduct.

### Fifth Cause of Action
### (Unjust Enrichment)

65. Plaintiffs hereby incorporate all of the averments in the paragraphs above as if fully set forth herein.

66. Sirkin unjustly obtained substantial benefits through the misappropriation of an amount that is believed to be in excess of $6 million from the Company.

67. The enrichment of Sirkin by allowing him to keep the corporate funds he has misappropriated would be unjust.

68. For that reason, Sirkin has been unjustly enriched and should not in good conscience and equity be permitted to retain the Company's funds in an amount believed to be in excess of $6 million, plus interest thereon, the exact amount to be proven at trial.

### Sixth Cause of Action
### (Declaratory Judgment Regarding Termination)

69. Because of the foregoing acts of misconduct as well as his unsatisfactory performance, Sirkin's employment with Perrigo was terminated on August 9, 2007. At the time, Sirkin was an at-will employee.

70. There presently exists an actual and justiciable controversy between Perrigo and Sirkin as to whether the termination of his employment was consistent with any and all applicable contractual and legal obligations. Absent a declaration that Perrigo's termination of Sirkin was lawful, Sirkin will continue to assert that his employment with Perrigo was wrongfully terminated, and he will thereby continue to cause Perrigo injury.

## Request For Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a. Awarding Perrigo compensatory damages on its First through Sixth Claims in such sums as shall be proven at trial and now reasonably believed to be in the millions of dollars;

b. Awarding Perrigo such amount that represents its damages and expenses incurred in uncovering Sirkin's misconduct;

c. Awarding Perrigo such amount as represents all salary and other compensation paid to Sirkin during the period of his misconduct;

d. Awarding Perrigo the imposition of a constructive trust on the property of Sirkin;

e. Awarding Perrigo the appointment of an interim Receiver to take possession of Sirkin's assets pending judgment herein;

f. Awarding Perrigo its reasonable attorneys' fees and disbursements;

g. Awarding Perrigo prejudgment interest from the various dates of the misconduct established herein;

h. Declaring that Perrigo's termination of Sirkin was not in breach of any contractual obligations and otherwise lawful; and

NY - 025645/000002 - 1076905 v1

     i.    Awarding Perrigo such other and further relief as may be just and proper, together with the costs and disbursements of this action.

Dated: March 13, 2008

                                                    Respectfully submitted,

                                                    HOGAN & HARTSON, LLP

                                          By: _____
                                                     Sandhya P. Kawatra
                                                  875 Third Avenue
                                                  New York, NY  10022
                                                  Telephone:  (212) 918-3000
                                                  Facsimile: (212) 918-3100

                                                  Steven J. Routh
                                                  Robert B. Wolinsky
                                                  HOGAN & HARTSON, LLP
                                                  555 Thirteenth Street, N.W.
                                                  Washington, DC 20004-1109
                                                  Telephone:  (202) 637-5600
                                                  Facsimile:  (202) 637-5910

                                                  Attorneys for Plaintiff Perrigo Company and
                                                  Perrigo New York, Inc.